[No. 2112]

ALFRED WORTHINGTON, RELATOR, *v.* THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF NEVADA, AND HON. T. F. MORAN, JUDGE OF SAID COURT, RESPONDENTS.

[142 Pac. 230]

1. STATUTES—TITLE—SUFFICIENCY.
     The title of an act entitled "An act relating to marriage and divorce" is sufficient, within Const. art. 4, sec. 17, providing that each law shall embrace but one subject and matters properly connected therewith, to justify provisions in the body of the act prescribing the length of residence required before parties may apply for a divorce.

2. STATUTES—TITLE—SUFFICIENCY.
     Notwithstanding Const. art. 4, sec. 17, providing that each law shall embrace but one subject and matters properly connected therewith, a statute may contain several provisions, provided they relate to the subject expressed in the title, or are properly connected therewith.

3. CONSTITUTIONAL LAW—STATUTES—VALIDITY.
     That a statute has for years been enforced by the courts, without its constitutionality being challenged, may be considered as a recognition of its constitutionality, and courts will seldom entertain questions of the constitutionality of a statute recognized as valid in the adjudication of rights, and when the invalidity of the statute would lead to serious consequences.

4. STATUTES—TITLE—AMENDMENTS.
     The act of February 15, 1875 (Stats. 1875, c. 22), entitled "An act to amend an act entitled 'An act relating to marriage and divorce, approved November 28, 1861,'" and containing only three sections, purports, by section 1, to amend section 22 of the original act by reenacting the section as changed. Sections 2 and 3 are the ordinary repeal of inconsistent laws, and a provision as to when it shall take effect. The act of February 20, 1913 (Stats. 1913, c. 10), entitled "An act to amend an act entitled 'An act to amend an act reating to marriage and divorce, approved November 28, 1861,'" purports to amend

"section 22" by reenacting it with the changes affected by the amendment and repealing conflicting acts. *Held* that, in view of Const. art. 4, sec. 19, providing that no law shall be revised or amended by reference, but the act or section as amended shall be reenacted and published, the act of 1875 did not repeal section 22 of the original act, and the act of 1913 was not void as attempting to amend section 22, after such repeal, but the unchanged part of the section as originally enacted continued in force, notwithstanding the amendments, so that the title of the act of 1913 is sufficient.

5. STATUTES—TITLE—CLERICAL MISTAKES—EFFECT.

The intention of the legislature to amend a specified section of the statute must govern, and a clerical mistake as to the section amended must be disregarded.

6. STATUTES—SPECIAL ACTS GRANTING DIVORCE—CONSTITUTIONAL PROHIBITION.

The constitution, prohibiting any special laws granting divorce, renders void any special act granting divorce, as divorces were granted by parliament and state legislatures prior to the constitutional provision.

7. STATUTES—"SPECIAL LAW."

The provision in the act of February 20, 1913 (Stats, 1913, c. 10), amending section 22 of the marriage and divorce act of 1861 (Stats. 1861, c. 33), as amended in 1875 (Stats. 1875, c. 22), by declaring that when, at the time of the accrual of a cause for divorce, the parties shall not both be *bona fide* residents of the state, no court shall grant divorce, unless either party shall have been a *bona fide* resident for not less than one year next preceding the commencement of the action, is of general uniform operation throughout the state, and applies the same in every part of the state, and to all persons under similar circumstances, and is not a local or special law within Const. art. 4, sec. 20, prohibiting any local or special law granting a divorce.

8. CONSTITUTIONAL LAW—DIVORCE—EQUAL PROTECTION OF THE LAWS—CLASSIFICATION—JURISDICTION—RESIDENCE.

The act of February 20, 1913 (Stats. 1913, c. 10), amending section 22 of the marriage and divorce act of 1861 (Stats. 1861, c. 33), as amended in 1875 (Stats. 1875, c. 22), by declaring that when, at the time a cause for divorce accrues, the parties shall not have been *bona fide* residents, the court shall not grant a divorce, unless either party shall have been a *bona fide* resident for not less than a year, provides for a classification of nonresidents at the time of the accrual of the cause of action for divorce, and the classification is reasonable, and does not conflict with the fourteenth amendment to the federal constitution guaranteeing the equal protection of the laws.

9. STATUTES—LOCAL OR SPECIAL LAWS.

Reasonable classifications in a legislative act are not prohibited by the constitution prohibiting the passage of local or special laws.

10. DIVORCE—JURISDICTION OF COURTS—STATUTORY PROVISIONS.

The courts have no inherent power to grant a divorce; but such power must be conferred by statute.

11. DIVORCE—COURTS—JURISDICTION.

The courts of a state have no jurisdiction to grant a divorce, unless at least one of the parties has a domicile in the state, and the appearance of a nonresident defendant will not invest the court with jurisdiction of a suit brought by a person who has no *bona fide* domicile in the state.

12. CONSTITUTIONAL LAW—DISCRIMINATION AGAINST NONRESIDENTS.

A statute of a state which provides that where, at the time of the accrual of a cause for divorce, the parties shall not be both *bona fide* residents, no court shall grant a divorce, unless either party shall have been a *bona fide* resident for not less than one year next preceding the bringing of the action, does not violate Const. U. S. art. 4, sec. 2, guaranteeing to citizens of each state all privileges and immunities of citizens in the several states; there being a distinction between citizenship and residence and the rights of citizens and residents, and the constitution guaranteeing no rights to citizens as to divorce.

13. DIVORCE—STATUTES—APPLICABILITY.

The provisions of the act of February 20, 1913 (Stats. 1913, c. 10), amending section 22 of the marriage and divorce act of 1861 (Stats. 1861, c. 33), as amended by the act of February 15, 1875 (Stats. 1875, c. 22), by declaring that the court shall not grant a divorce, unless either party shall have been a resident for not less than one year, relates merely to procedure, and not to the cause of action, and applies to cases where the cause of action accrued before the act took effect.

14. CONSTITUTIONAL LAW—IMPAIRING OBLIGATION OF CONTRACTS.

The constitutional prohibition against the impairment of obligation of contracts does not apply to divorces, which are under the control of the legislature, and the provision of the act of February 20, 1913 (Stats. 1913, c. 10), amending section 22 of the marriage and divorce act of 1861 (Stats. 1861, c. 33), as amended in 1875 (Stats. 1875, c. 22), by declaring that when, at the time a cause of divorce accrues, the parties are not both residents, the court cannot have jurisdiction, unless either party has been a *bona fide* resident for not less than one year, does not impair the obligation of contracts, though it be construed as relating to a cause for divorce.

15. DIVORCE—NATURE OF RIGHT—PRIVILEGES OF CITIZENS.

The right to a divorce is not a guaranteed privilege of the citizens, and the right to divorce is limited to the causes and subject to the requirements prescribed by state statute.

16. CONSTITUTIONAL LAW—STATUTES—VALIDITY.

The court, in determining the validity of a statute, will not consider its policy, wisdom, or expediency, but will enforce it in accordance with the intention of the legislature, unless clearly in conflict with the constitution.

17. CONSTITUTIONAL LAW—CONSTRUCTION OF CONSTITUTIONAL PRO-
VISIONS.

The provisions of the constitution, state or federal, do not
cover rights, privileges, and obligations not specified and not
existing or understood at the time of its adoption, or not in
force by long acquiescence, or by continued· official or public
approval.

ORIGINAL PROCEEDING.  *Mandamus* by Alfred Worth-
ington against the Second Judicial District Court in and
for Washoe County and Judge thereof to compel respon-
dents to issue an order for the publication of a summons
in an action by petitioner for divorce.  **Denied.**

*Sweeney & Morehouse, W. D. Jones,* and *N. J. Barry,*
for Petitioner.

*A. A. Heer, S. Summerfield, R. G. Withers, Prince A.
Hawkins, George S. Brown, John S. Orr,* and *L. A.
Gibbons,* for Respondents.

*H. D. Danforth, amicus curiæ.*

By the Court, TALBOT, C. J.:

Petitioner applies for a writ of mandate commanding
the Honorable T. F. Moran, judge of the Second judicial
district court, to issue an order for the publication of
summons in the action of *Alfred Worthington, Plaintiff,*
v. *Cecelia Worthington, Defendant,* for divorce, which
was brought in that court on the 11th day of February,
1914.

It is alleged that the petitioner filed his verified com-
plaint in that case, stating two causes of action, in con-
formity with the laws of this state relating to marriage
and divorce; that the summons and certified copy of
complaint could not be served personally upon the defen-
dant because she resides, and for a long time has resided,
in the city of Daly, San Mateo County, State of Califor-
nia, and is not now, and never has been, a resident of the
State of Nevada.  Petitioner made and presented to the
district judge an affidavit setting forth these facts, and
stating that on the 20th day of July, 1913, he became,

and ever since has been, a resident of Washoe County, State of Nevada; that he needed an order in conformity with the laws of this state authorizing the publication of the summons and the deposit of a certified copy of the complaint and summons in the postoffice at Reno, addressed to the defendant at her place of residence, with the postage thereon prepaid, so that she might be notified of the action.

The district judge refused to make the order for publication and service of summons, upon the ground that the petitioner had not been a resident of the county of Washoe, State of Nevada, for the full period of one year before the commencement of the action, and based his refusal upon section 22 of the act relating to marriage and divorce, as amended at the last session of the legislature by an act approved February 20, 1913, under the title: "An act to amend an act entitled 'An act to amend an act entitled "An act relating to marriage and divorce," approved November 28, 1861,' as approved February 15, 1875."

This act provides:

"SECTION 1. Section twenty-two of said act is amended so as to read as follows:

"SEC. 22. Divorce from the bonds of matrimony may be obtained, by complaint under oath, to the district court of the county in which the cause therefor shall have accrued, or in which the defendant shall reside or be found, or in which the plaintiff shall reside, if the latter be either the county in which the parties last cohabited, or in which the plaintiff shall have resided six months before suit be brought, for the following causes: First—Impotency at the time of the marriage continuing to the time of the divorce. Second—Adultery since the marriage, remaining unforgiven. Third—Wilful desertion, at any time, of either party by the other, for the period of one year. Fourth—Conviction of felony or infamous crime. Fifth—Habitual gross drunkenness, contracted since marriage, of either party, which shall incapacitate

such party from contributing his or her share to the support of the family.  Sixth—Extreme cruelty in either party.  Seventh—Neglect of the husband, for a period of one year, to provide the common necessaries of life, when such neglect is not the result of poverty on the part of the husband which he could not avoid by ordinary industry.  *Provided,* that when at the time the cause of divorce accrues, the parties shall not both be *bona fide* residents of the state, no court shall have jurisdiction to grant a divorce, unless either the plaintiff or the defendant shall have been a *bona fide* resident of the state for a period of not less than one year next preceding the commencement of the action.

"SEC. 2.  All acts or parts of acts in conflict with this act are hereby repealed.

"SEC. 3.  This act shall be in effect from and after the first day of January, 1914."

(Stats. 1913, c. 10.)

The only change made by this amendment is the addition of the last sentence quoted in section 22, which begins with the word "*Provided.*"  Otherwise the section is the same as the amendment of 1875, which was the same as section 22 of the act as originally passed by the first territorial session of the legislature in 1861 (Stats. 1861, c. 33), excepting that the amendment of 1875 (Stats. 1875, c. 22) shortened from two years to one year the time required for desertion and failure to provide.

Petitioner makes no objection to the act of 1875, but directs his batteries against the last amendment.  It is said that there was no section 22 to amend in 1913, and that the legislature cannot inject into the statutes by the last amendment the jurisdiction of the court, not germane to the title.

Also, it is claimed that this act is in violation of the following provisions of the state constitution:

"All men are, by nature free and equal and have certain inalienable rights among which are those of enjoying

and defending life and liberty; acquiring, possessing, and protecting property and pursuing and obtaining safety and happiness." (Section 1, art. 1.)

"Each law enacted by the legislature shall embrace but one subject, and matter properly connected therewith, which subject shall be briefly expressed in the title; and no law shall be revised or amended by reference to its title only; but, in such case, the act as revised, or section as amended, shall be reenacted and published at length." (Section 17, art. 4.)

"The legislature shall not pass local or special laws * * * granting divorce." (Section 20, art. 4.)

"In all cases enumerated in the preceding section, and in all other cases, where a general law can be made applicable, all laws shall be made general and of uniform operation throughout the state." (Section 21, art. 4.)

It is further contended that the statute is in conflict with section 2, article 4, of the constitution of the United States, which provides that:

"The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states"

—and of the fourteenth amendment, which specified that:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[1] The objection that the amendment requiring one year's residence in certain cases to give the court jurisdiction in an action for divorce is not germane to the title is untenable. To sustain such a contention would be in effect saying that the provision of the act originally passed requiring six months' residence under certain circumstances was unconstitutional because under a similar title, and that divorces granted since the organization of the territory and state are void, resulting in

many cases of bigamy, illegitimacy, and failure of inheritance.

We had occasion to examine similar objections to the sufficiency of titles to legislative acts in the cases of *State v. State Bank and Trust Co.*, 31 Nev. 456, 103 Pac. 407, 105 Pac. 567, and *Ex Parte Ah Pah,* 34 Nev. 283, 119 Pac. 770.   In the former case we said:

"The main principles controlling these questions have been well-nigh settled by this and other courts.   That section 17, article 4, of the constitution, providing that 'each law enacted by the legislature shall embrace but one subject and matters properly connected therewith,' is mandatory must be conceded.   In regard to this objection, we need only determine whether this action and the decree of the district court relate to matters germane to the subject expressed in the title of the act, or to what is properly connected therewith."

In that case we held that "An act creating a board of bank commissioners, defining their duties, providing for the appointment of a bank examiner, prescribing his duties, fixing his compensation, providing penalties for the violation of the provisions of this act, and other matters relating thereto" (Stats. 1907, c. 119), although providing by section 10 for an action by the attorney-general against a banking corporation on the decision by the bank examiner and commissioners that it is unsafe for it to continue business, and that, if the court shall find it unsafe, it shall appoint a receiver, does not contravene the above constitutional provision.

[2] The title of the original and the two amendatory acts relate to marriage and divorce.   Divorce, being the dissolution of the marriage relation, necessarily relates to marriage.   The length of residence required before parties apply for a divorce, whether it be six months, or one year, or a longer or shorter period, necessarily pertains to divorce, and is a matter connected with the title of the act.   The amendment is as free from constitutional objection as if it had been entitled an act relating to divorce, or an act relating to the jurisdiction of the

district court.   Many acts, such as the ones relating to crimes, punishments, civil practice, and criminal practice relate to numerous matters.   It is sufficient if they relate to the subject briefly expressed in the title and anything properly connected therewith.

[3] The constitution of the state, adopted in 1864, provided that all territorial laws not repugnant to its provisions shall remain in force until altered or repealed. (Rev. Laws, sec. 386.)   For nearly half a century the marriage and divorce act has been recognized by.all the courts of this state as a valid existing law, and the marital rights of numerous parties have been settled according to its provisions.   Where an act of the legislature has for a long period of years been enforced by the courts of a state, without its constitutionality being challenged, that fact may be considered a virtual recognition of its constitutionality.   Courts seldon entertain questions of the constitutionality of an act so long and repeatedly recognized as valid in the adjudication of the most important relations and rights, and when the interpretation of the statute would lead to consequences most serious.

In the Tiedemann case, 36 Nev. 494, 500, 137 Pac. 824, this court treated the amendment of 1875 of section 22 of the marriage and divorce act as a part of the act of 1861, and not as a separate act, and referred to the act of 1913 as amendatory of section 22 of the original act. While the question was not specifically presented for consideration in that case, this view of considering amendatory statutes is well supported by the authorities.

[4] Under the title and language of the act of 1875, before mentioned, considered with the provision in section 19, article 4, of the constitution, that "no law shall be revised or amended by reference to its title only, but, in such case, the act as revised, or section as amended, shall be reenacted and published at length," it is apparent that the legislature intended to amend section 22 of the original act relating to marriage and divorce.   It is contended that the act of 1875 repealed section 22 of the original act, and that the act of 1913 is void, because it

attempts to amend that section after it has been repealed.
The unchanged part of a section amended is deemed to
continue in force.  From the title stating so and the
language used, it is apparent that by the act of 1913 the
legislature intended to amend the act of 1875.  No lan-
guage could have more definitely indicated this purpose.
The "act as revised and section as amended" was "reen-
acted and published at length."  Each of the later acts
is entitled "An act to amend," and not "An Act to repeal."
The statement in section 2 of the act of 1913 that "all
acts and parts of acts in conflict with this act are hereby
repealed" is a stereotyped form, often unnecessarily used
in bills.  It has no effect, and may be regarded as sur-
plusage.  We think the act of 1875 should be considered
as an amendment, as defined by lexicographers and
scholars, and as it was intended, the same as such acts
have been considered by legislatures and compilers of
laws in this state, instead of a repeal, as ordinarily under-
stood, of section 22 as originally passed.  Sections 2 and
4 of our act relating to marriage and divorce were
amended by an act approved March 5, 1867 (Stats. Sp.
Sess. 1867, c. 51, p. 88), and in the subsequent amend-
ment of these sections by the acts approved February 5,
1891 (Stats. 1891, c. 5), and March 6, 1899 (Stats. 1899,
c. 35), the legislature, similarly as in other second amen-
datory acts, treated them as numbered sections of the
original act, without reference to them as sections of the
first amendatory act.

[5]  As the act of 1913 reenacts at length, in compliance
with section 17, article 4, the language designated as
section 22 in the act of 1875, it must have been the inten-
tion to amend that section, and no other.  But if it be
conceded for the argument that the act of 1875 was a
new act which repealed section 22, and that the act of
1913 ought to have specified that section 1, instead of
section 22, was amended, it would still be clearly appar-
ent that there was only a mistake in this reference to the
section, and that the one reenacted at length, and none
other, was intended to be amended.  As often held, the

intention of the legislature should govern, and clerical mistakes should be disregarded.

In New York, an act of 1883 (Laws 1883, c. 414) purported to amend section 16 of the act of 1856 (Laws 1856, c. 179), which, it was claimed, had been repealed by an act of 1864 (Laws 1864, c. 555). The court in *People* v. *Canvassers*, 143 N. Y. 84, 37 N. E. 649, held a different opinion as to the repeal, but concluded that, even if the act of 1856 was repealed as claimed, the amendatory act of 1883 was nevertheless valid. The court said:

"The enactment of this law is put into the form of an amendment of a law, which was standing upon the statute books, and whether that earlier law, by force of subsequent legislation, had become inoperative is wholly immaterial. The only question is: Has the legislature, in the enactment complained of, expressed its purpose intelligently and provided fully upon the subject? If it has, then its act is valid and must be upheld. That is the case here. The act of 1883 contains all that is provided for in the particular section of the act of 1856, and gives full power to the boards of supervisors with respect to the formation of school commissioners' districts. A law thus explicit and complete may not be disregarded or invalidated because of a possible mistake of the legislature with respect to the existence of the statute in amendment of which the act is passed. It is an enactment of a law, in any view."

The Supreme Court of Massachusetts, in *Commonwealth* v. *Kenneson*, 143 Mass. 419, 9 N. E. 763, said:

"The defendant contends that Stats. 1886, c. 318, sec. 2, is inoperative, because it purports to be an amendment of the Pub. Stats. c. 57, secs. 5, 9, and he says that said section 9 was repealed by Stats. 1885, c. 352, sec. 6. The argument is that an amendment of a repealed statute is a nullity. * * * The intention of the legislature is plain that, after Stats. 1885, c. 352, took effect, instead of Pub. Stats. c. 57, sec. 9, the sixth section of Stats. 1885, c. 352, should be in force, and that after Stats. 1886, c.

318, took effect, section 2 of this statute should be in force, instead of section 6 of Stats. 1885, c. 352. The sections in each statute are complete in themselves, and, being substitutes for each other, stand like independent enactments. The only defect in the statute is that Stats. 1886, c. 318, sec. 2, refers to Pub. Stats. c. 57, sec. 9, and not to this section as amended; but the intention is evident."

In *Fletcher* v. *Prather,* 102 Cal. 414, 36 Pac. 658, under a constitutional provision similar to ours, it was held that the amended section of an act takes the place of the original section by its appropriate number in the original act, and that portions not altered are to be considered as having been the law from the time they were enacted, and the new provisions are to be considered as having been enacted at the time of the amendment.

"The slight variance in reciting the title of the act amended will be immaterial if the act intended is clearly identified."

"An act entitled 'An act to amend section 1733 of chapter 11 of title 11 of the original code of Oregon' was held good, although there was no such chapter or title; there being but one section with the number given."

"The intent of the legislature was held to be plain, and effect was given to the act, so that, while the title and act purported to amend section 202 of article 8 of a specified statute, they were given effect as an amendment of section 1 of article 8."

(Lewis's Sutherland, Statutory Construction, 2d ed. sec. 138; *Otis* v. *People,* 196 Ill. 542, 63 N. E 1053; *Northern Pacific Express Co.* v. *Metschan,* 90 Fed. 80, 32 C. C. A. 530.)

Mr. Sutherland also says that where the title of the amendatory act recites the title of the act amended, and there is only one act with that title, error in referring to the date of the approval of the act amended will not vitiate the title. (*American Surety Co.* v. *Great White Spirit Co.,* 58 N. J. Eq. 526, 43 Atl. 579; *Citizens' Street R. R. Co.* v. *Haugh,* 142 Ind. 254, 41 N. E. 533; *Alberson* v. *Mayor,* 82 Ga. 30, 8 S. E. 869.)

At sections 231, 135, 137, and 233 of that work, and over the citation of many cases, it is said:

"In the amendment or revision of a statute two things are required: First, the title of the act amended or revised should be referred to, and, secondly, the act as revised, or section as amended, should be set forth and published at full length. * * * It is not required that the amendatory act state that certain words of a specific section are stricken out and others inserted, and then set out in full the section as amended; it is sufficient if the section as amended be set out in full. * * * If the references to the act to be amended in the title and body of the amendatory act is sufficient for identification, it is all that is required, and slight errors will be disregarded."

"By force of our constitutional provision, requiring the object of every law to be expressed in its title, the title limits the sphere within which the enacting clause can operate."

"The constitutional requirement under discussion as applied to the acts of this character when they contain matter which might appropriately have been incorporated in the original act under its title is satisfied generally if the amendatory or supplemental act identifies the original act by its title, and declares the purpose to amend or supplement it. Under such a title, alterations by excision, addition, or substitution may be made, and any provisions may be enacted which might have been incorporated in the original act. A title which expresses a purpose to amend an earlier enactment, referring to the earlier enactment by its title, in which the subject of the proposed legislation is clearly expressed, is no more or less than the expression of a purpose to deal with the subject so expressed in the title of the earlier enactment."

"There is a conflict of authority as to whether a section which has been repealed can be amended. The question usually arises where a section of an act is amended 'to read as follows,' and is then again amended in the same

manner and by the same description, ignoring the first amendment. Most of the older and some of the more recent cases hold that such an amendatory act, or the amendment of a repealed section, is a nullity. A repeal by implication is said to stand upon the same footing in this respect as a direct or express repeal. 'While there is some conflict of opinion on the subject,' says the United States Court of Appeals, 'the decided weight of authority and the better opinion is that an amendatory statute is not invalid, though it purport to amend a statute which had previously been amended, or for any reason had been held invalid.' This view, we believe, is sustained by the decisions."

(*Wilkerson* v. *Ketler,* 59 Ala. 306; *State* v. *Warford,* 84 Ala. 15, 3 South. 911; *Ex Parte Pierce,* 87 Ala. 110, 6 South. 392; *Harper* v. *State,* 109 Ala. 28, 19 South. 857; *Harper* v. *State,* 109 Ala. 66, 19 South. 901; *O'Rear* v. *Jackson,* 124 Ala. 298, 26 South. 944; *Reynolds* v. *Board of Education,* 66 Kan. 672, 72 Pac. 274; *Lewis* v. *Brandenburg,* 105 Ky. 14, 47 S.W. 862, 48 S.W. 978; *Lang* v. *Calloway,* 68 Mo. App. 393; *Parlin Orendorf Co.* v. *Hord,* 78 Mo. App. 279; *Fenton* v. *Yule,* 27 Neb. 758, 43 N. W. 1140; *State* v. *Babcock,* 23 Neb. 128, 36 N. W. 348; *Baird* v. *Todd,* 27 Neb. 782, 43 N. W. 1143; *State* v. *Partridge,* 29 Neb. 158, 45 N. W. 290; *State* v. *Bemis,* 45 Neb. 724, 64 N.W. 348; *State* v. *Kearney,* 49 Neb. 325, 68 N.W. 533; *State* v. *Kearney,* 49 Neb. 337, 70 N. W. 255; *State* v. *Wahoo,* 62 Neb. 40, 86 N. W. 923; *Van Clief* v. *Van Vechten,* 55 Hun, 467, 8 N. Y. Supp. 760; *White* v. *Boody,* 74 Hun, 39, 26 N. Y. Supp. 294; *People* v. *Canvassers,* 77 Hun, 372, 28 N. Y. Supp. 871; *People* v. *Upson,* 79 Hun, 87, 29 N. Y. Supp. 615; *Columbia Wire Co.* v. *Boyce,* 104 F'ed. 172, 44 C. C. A. 588; *Heinz* v. *Butte M. Co.,* 107 Fed. 165, 46 C. C. A. 219; *Minnesota & Mont. L. & I. Co.* v. *Billings,* 111 Fed. 972, 50 C. C. A. 70.)

[6] The section in our organic act providing that the legislature shall not pass special laws granting divorces would render void any special act attempting to grant

a divorce, as divorces were granted by parliament and state legislatures prior to the adoption of such constitutional provisions in this and other states.

[7] The provisions in the last amendatory statute that when, at the time the cause of divorce accrues, the parties shall not both be *bona fide* residents of the state, no court shall have jurisdiction, unless one of the parties shall have been a *bona fide* resident of the state for a period of not less than one year next preceding the commencement of the action, is of general and uniform operation throughout the state, and not in conflict with the requirements that all such laws must be of uniform and general operation. It applies the same in every part of the state, and the same to all persons under similar circumstances.

As seen, our law in its present form, except that six months' instead of one year's residence and two instead of one year's desertion or failure to provide are required, was passed at the first session of the territorial legislature for the people here before there was any railroad in this state or modern means of transportation, when the laws of some other states did not require as long a residence, and when there was no anticipation that people would come to this state for the purpose of obtaining divorces. Long after the enactment of our law requiring six months' residence Indiana allowed divorce actions to be instituted in the county in which the plaintiff was a *bona fide* resident, without requiring any specified period.

[8] Under the amendment of 1913 there is a distinction or classification regarding a longer residence when both of the parties are not *bona fide* residents of the state. Ever since the passage of the act relating to marriage and divorce at the first session of the territorial legislature there have been the same classifications relating to residence which appear in the forepart of section 22, and these never have been and are not now questioned. In addition to the classifications regarding residence and venue which have always existed in that act, it is provided that females not under 18 may marry without

parental consent, while males are not allowed to marry without obtaining consent until after they are 21 years of age, and failure of the husband to provide for the wife is made a ground for divorce, while no such cause is specified in favor of the husband.

It could be contended with as much force that the six months' requirement in the original act is void as that the classification requiring one year under certain circumstances is unconstitutional. Classifications similar in principle are common in other states. Under certain circumstances one year's residence is required before filing suit for divorce in Arizona, Arkansas, California, Colorado, Georgia, Illinois, Iowa, Kansas, Kentucky, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, unless personal service is made, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, Wyoming, and Nevada—33 states—and Porto Rico. Two years is required in Florida, Indiana, Maryland, New Jersey, North Carolina, Rhode Island, Tennessee, and Vermont—8 states—and in Hawaii. Three years' residence is required in Alabama, Connecticut, and the District of Columbia. In Massachusetts a residence of five years is required, unless the parties were inhabitants at the time of marriage, and libelant has lived in the state three years. A residence of six months is required in Idaho. Louisiana has a provision in relation to marriages having been solemnized in the state. In Delaware *bona fide* residence is required, and divorces are not granted if the cause accrued in another state, and petitioner was a nonresident at the time, unless for limited causes recognized by the laws of the state.

The constitution of South Carolina of 1868 provides that: "Divorces from the bonds of matrimony shall not be allowed but by the judgment of a court, as shall be prescribed by law." (Article 14, sec. 5.)

In 1895 the constitution of that state was amended so as to provide that: "Divorces from the bonds of matri-

mony shall not be allowed in this state." (Article 17, sec. 3.)

In Texas formerly only six months' residence was required; but an amendment approved April 1, 1913, provides that no suit for divorce shall be maintained in the courts of that state, unless the petitioner shall: "Be an actual, *bona fide* inhabitant of the state for a period of twelve months, and shall reside in the county where the suit is filed six months; *provided,* that such suit shall not be heard or divorce granted before the expiration of thirty days after the same is filed; * * * *provided further,* that in addition to the grounds for divorce now provided by statute, that where any husband and wife have lived without cohabitation for as long as ten years, the same shall be sufficient grounds for divorce."

In South Carolina, where divorce is not allowed for any cause, and in New York, where it may be obtained only for adultery, if the husband is about to kill his wife, and does kill another person who intercedes to defend her, and is sent to prison for life, she can obtain no relief from the bonds of matrimony.

A few of the states have passed eugenic laws prohibiting the marriage of persons afflicted with certain incurable, contagious, or transmissible diseases.

Similarly to ours, many of the states have classifications based on alternative conditions which in certain instances make the one year's residence unnecessary. For instance, a residence of one year is required in Colorado, unless the act was committed in the state, or one of the parties resided in the state at the time; three years in Connecticut, unless the cause arose after removal to the state; in Illinois one year, unless the offense was committed in the state; in Kentucky one year, unless the act was committed while the plaintiff was a resident of the state; in Maine one year, unless the plaintiff resided in the state when the cause accrued, or the parties were married in the state; in Michigan there must be a residence of two years, if the cause arose out of the state; in Minnesota one year, except where adultery was committed in the

state; in Mississippi one year unless both parties are domiciled in the state, or service has been made on the defendant in the state; in Missouri one year, unless the act was committed in the state, or while one of the parties resided in the state; and in Porto Rico one year, unless the act was committed while one of the parties resided there; in Nebraska two years' residence is required if the cause arose out of the state.

In most of the states causes for divorce are substantially the same as in Nevada. The draft of an act to make uniform the law regulating divorce and the annulment of marriage, prepared by the committee of the American Bar Association, and recommended to the commissioners on uniform state laws, designates causes for the dissolution of marriage substantially the same as the ones contained in our statute, excepting that our clause relating to the neglect of the husband to provide for the wife is omitted, and two years' desertion, instead of one, and habitual drunkenness for two years, instead of drunkenness which incapacitates from contributing the proper share to the support of the family, are required. In the proposed uniform act it is provided that two years' residence is necessary in order to give jurisdiction, except when the cause is adultery or bigamy, or there are certain other classified circumstances. That the various states may make such classifications and require this or any desired length of residence does not appear to have been questioned by the eminent lawyers and jurists constituting the committee preparing and recommending the act and composing the American Bar Association.

[9] In the enactment and administration of the laws many classifications necessarily exist. The defendant in a civil action must answer in ten days if served in the county, within twenty days if served out of the county and in the district, and within forty days if served out of the district. The statutes provide that nonresident defendants are required to give security for costs. Classifications in regard to cities, counties, officials, public service, mining, and other corporations, business and professional

vocations, and in many other ways have been made and sustained when reasonable. The residential classification made by the amendment of 1913, being similar to the classifications made in various states, which have been enforced without exception, and to the ones made in our own statute relating to marriage and divorce, and acted upon and accepted without question for fifty years, we are unable to say that it is unreasonable or unconstitutional. It is well settled that reasonable classifications in a legislative act are not inimical to constitutional provisions against the passage of special laws. (*Singleton* v. *Eureka County*, 22 Nev. 97, 35 Pac. 833; *Ex Parte Spinney*, 10 Nev. 323; *Russell* v. *Esmeralda Co.*, 32 Nev. 304, 107 Pac. 890; *Central Loan & Trust Co.* v. *Campbell*, 173 U. S. 84, 19 Sup. Ct. 346, 43 L. Ed. 623; *Harwood* v. *Wentworth*, 162 U. S. 547, 16 Sup. Ct. 890, 40 L. Ed. 1069; *Waite* v. *Santa Cruz*, 184 U. S. 302, 22 Sup. Ct. 327, 46 L. Ed. 552; 36 Cyc. 992; *Atchison, etc. R. R.* v. *Matthews*, 174 U. S. 96, 19 Sup. Ct. 609, 43 L. Ed. 909; *Deyoe* v. *Superior Court*, 140 Cal. 476, 74 Pac. 28, 98 Am. St. Rep. 73.)

[10] In determining constitutional questions presented, the law of divorce as it existed at and prior to the time of the adoption of the constitution should be considered. There has been divorce in some form since the dawn of history. Under the Mosaic law the husband could write the wife a bill of divorcement and send her away, and she could go and become another man's wife. (Deuteronomy, c. 24.) About the beginning of the Christian era there arose two famed schools of the law at Jerusalem. One, under Shammai, taught that divorce was unlawful except for adultery; the more popular one, under Hillel, authorized divorce for any cause. With the early Romans divorce was at the will of the husband, and later upon the agreement of the parties. In more modern times, in all civilized countries, divorce has been subject to the limitations or consent of the state or church in control. In England at the time of the secession of the colonies, and for a long time previously, divorce from bed and board had been allowed by ecclesiastical courts, and absolute

divorces to a favored few by special acts of parliament. Otherwise divorces were not granted under the common law, and there was no general act of parliament authorizing them, and no jurisdiction in the chancery or common-law courts to grant divorces until eighty-one years after the declaration of independence.

As there were no ecclesiastical courts in this country, divorces were granted by special act of the legislature, and later in most states under general statutory provisions. As Congress has only such powers as are specifically granted or implied under the provisions of the constitution of the United States, and as these do not embrace divorce, and all legislative powers not granted to Congress are reserved to the legislatures of the various states, except as inhibited by some provision of the state constitution, and as there is no inherent or inherited power in the courts of this country to grant divorces, it follows that our tribunals have no jurisdiction or authority in regard to divorces, except such as may be conferred upon them by the legislature, which has power to pass general and special laws, except as prohibited by some constitutional provisions. The law favors marriage as the most important of the domestic relations, but allows its dissolution only under such restrictions as the legislature may deem best for the public welfare.

[11] The authorities hold that the courts of the state have no jurisdiction to grant a divorce, unless at least one of the parties has a domicile in the state. (*People* v. *Dawell,* 25 Mich. 247, 12 Am. St. Rep. 260, opinion by Judge Cooley; *Maguire* v. *Maguire,* 7 Dana, Ky. 181; *Hare* v. *Hare,* 10 Tex. 355; *Strait* v. *Strait,* 10 D. C. 415; *Greenlaw* v. *Greenlaw,* 12 N. H. 200; *House* v. *House,* 25 Ga. 473; *Sewall* v. *Sewall,* 122 Mass. 156, 23 Am. Rep. 299; *Hoffman* v. *Hoffman,* 46 N. Y. 30, 7 Am. Rep. 299; *State* v. *Armington,* 25 Minn. 29; *Reel* v. *Elder,* 62 Pa. 308, 1 Am. Rep. 414.)

In *Hood* v. *State,* 56 Ind. 263, 26 Am. Rep. 21, it was held that a decree of divorce rendered in a state where neither of the parties lived at the time of rendition is

void for want of jurisdiction. Referring to this case, the Supreme Court of Kansas, in *Litowich* v. *Litowich*, 19 Kan. 451, 27 Am. Rep. 148, said:

"And this decision of the Supreme Court of Indiana is in accordance with the unbroken current of authority. (2 Bishop's Marriage & Divorce, sec. 144.) And where the judgment granting the divorce does not appear to be void upon its face, it may be shown to be void by evidence *aliunde.* (*Hoffman* v. *Hoffman,* 46 N. Y. 30, 33, 7 Am. Rep. 299; *Kerr* v. *Kerr,* 41 N. Y. 272; *Borden* v. *Fitch,* 15 Johns. N. Y. 121, 141, 8 Am. Dec. 225; *Leith* v. *Leith,* 39 N. H. 20; *Pollard* v. *Wegener,* 13 Wis. 569, 576.) And indeed any judgment from a sister state, void for want of jurisdiction, may be shown to be void in any proceeding, direct or collateral, and by evidence *dehors* the record, provided that the record itself does not show the invalidity of the judgment upon its face. (*Thompson* v. *Whitman,* 18 Wall. 457, 21 L. Ed. 897; *Knowles* v. *Gaslight Co.,* 19 Wall. 58, 22 L. Ed. 70; *Rape* v. *Heaton,* 9 Wis. 328, 76 Am. Dec. 269; *Ward* v. *Price,* 25 N. J. Law, 225; *Aldrich* v. *Kinney,* 4 Conn. 380, 10 Am. Dec. 151; *Starbuck* v. *Murray,* 5 Wend. N. Y. 148, 156, 21 Am. Dec. 172; *Shumway* v. *Stillman,* 6 Wend. N. Y. 447, 452; *Hall* v. *Williams,* 6 Pick. Mass. 232, 237, 17 Am. Dec. 356; *Carleton* v. *Bickford,* 13 Gray, Mass. 591, 74 Am. Dec. 652; *Pollard* v. *Baldwin,* 22 Iowa, 328; *Norwood* v. *Cobb,* 15 Tex. 500, 24 Tex. 551.)"

In *Howell* v. *Howell,* 87 Kan. 389, 124 Pac. 168, Ann. Cas. 1913E, 429, the court said: "Under these sections a party asking a divorce must, in any event, have been an actual resident, in good faith, of the state one year preceding the filing of his petition. The Howells, it seems, had not resided in Kansas the required time, and hence the court had no jurisdiction of the divorce proceeding."

In *Nicholas* v. *Maddox,* 52 La. Ann. 1493, 27 South. 966, cases are cited supporting the statement of the court that it has always been held in Louisiana that a husband or wife who acquires a domicile in that state

cannot maintain an action there against the absent spouse, who never acquired a domicile in that state.

In *McConnell* v. *McConnell,* 167 Mo. App. 680, 151 S.W. 175, it was held that under an act providing that an action for divorce should be had in the county where the plaintiff resides, and declaring that no person shall be entitled to a divorce who has not resided in the state for a year next before the filing of the petition, unless the offense complained of is committed within the state, the court had no jurisdiction of a suit for divorce by a non-resident husband for an act committed by the wife in the state while residing there.

In *Bechtel* v. *Bechtel,* 101 Minn. 511, 112 N. W. 883, 12 L. R. A. n. s. 1100, it was held that actual residence is necessary to give jurisdiction; and the note reviews numerous cases so holding.

In *Rumping* v. *Rumping,* 36 Mont. 39, 91 Pac. 1057, 12 L. R. A. n. s. 1197, 12 Ann. Cas. 1090, it was held that residence must be shown to give the court jurisdiction.

In *Andrews* v. *Andrews,* 188 U. S. 14, 23 Sup. Ct. 237, 47 L. Ed. 366, it was held that the state has exclusive jurisdiction over its citizens concerning the marriage tie and its dissolution, that the appearance of a nonresident defendant does not invest the court with jurisdiction of a suit for divorce instituted by a person who has no *bona fide* domicile within the state, and that the state may forbid the enforcement within its borders of a decree of divorce procured by its own citizens in another state while retaining their domicile in the prohibiting state. (*Haddock* v. *Haddock,* 201 U. S. 562, 26 Sup. Ct. 525, 50 L. Ed. 867, 5 Ann. Cas. 1; *Bell* v. *Bell,* 181 U. S. 175, 21 Sup. Ct. 551, and note under this case in 45 L. Ed. 804.)

In *Barber* v. *Barber,* 21 How. (62 U. S.) 582, 16 L. Ed. 226, the United States Supreme Court disclaimed any jurisdiction in the courts of the United States upon the subject of divorce, but held that the parties to a decree of divorce are bound by the state court having jurisdiction over the parties.

In 14 Cyc. 584, over the citation of authorities, it is said: "The courts of the state have no jurisdiction to decree a divorce between parties who do not reside therein."

In *Pugh* v. *Pugh,* 25 S. D. 7, 124 N. W. 959, 32 L. R. A. n. s. 954, it was held that an act requiring the plaintiff in a divorce case to have been an actual resident of the state for one year and the county within which the action was commenced for three months next preceding the commencement of the action is within the powers reserved by the state, and not in conflict with any provision of the constitution of the United States or of the state. The law was held not in conflict with the provision in the constitution of the State of South Dakota that: "No law shall be passed granting to any citizen, class of citizens, or corporation, privileges or immunities which upon the same terms shall not equally apply to all citizens or corporations."

In Tiffany's Persons and Domestic Relations (2d ed.), sec. 98, it is said: "Our courts have jurisdiction to entertain and grant suits for divorce only where such jurisdiction has been expressly conferred upon them by statute. It is a general rule that the jurisdiction of proceedings for a divorce depends on the domicile of the parties, irrespective of the place of marriage, and without reference to the place where the offense for which the divorce is sought was committed. To give the court jurisdiction, at least one of the parties must be domiciled in the state or territory where the action is brought, and, if neither party is domiciled in the state, the court has in fact no jurisdiction."

In an article on control of marriage and divorce in a law publication for June, 1914, it is said: "Jurisdiction and power to dissolve the marriage relation by divorce is purely statutory, throughout all portions of the United States, and the statutory power to enact statutes specifying causes or ground, procedure, and length of domicile required to confer jurisdiction, rests with the legislative bodies of each state."

Among the cases cited by the respondent, holding that divorce is statutory, are: *Franklin* v. *Franklin,* 40 Mont. 348, 106 Pac. 353, 26 L. R. A. n. s. 490, 20 Ann. Cas. 339; *Irwin* v. *Irwin,* 3 Okl. 186, 41 Pac. 369; *Dennis* v. *Dennis,* 68 Conn. 186, 36 Atl. 34, 34 L. R. A. 449, 57 Am. St. Rep. 95; *Dutcher* v. *Dutcher,* 39 Wis. 651; *Baugh* v. *Baugh,* 37 Mich. 59, 26 Am. Rep. 495; *Cizek* v. *Cizek,* 69 Neb. 797, 96 N.W. 657, 99 N.W. 28, 5 Ann. Cas. 464; *Noel* v. *Ewing,* 9 Ind. 37; *Williams* v. *Williams,* 136 Ky. 71, 123 S.W. 337; *Deyoe* v. *Superior Court,* 140 Cal. 476, 74 Pac. 28, 98 Am. St. Rep. 73; *State, ex rel. Hagert,* v. *Templeton,* 18 N. D. 525, 123 N.W. 283, 25 L. R. A. n. s. 234; *Ackerman* v. *Ackerman,* 200 N. Y. 72, 93 N. E. 192; *Martin* v. *Martin,* 173 Ala. 106, 55 South. 632; *Jones* v. *Jones,* 2 Overt. (Tenn.) 2, 5 Am. Dec. 645; *Carson* v. *Carson,* 40 Miss. 349; 1 Pomeroy, Eq. sec. 96; sec. 112, subd. 10; *Maslen* v. *Anderson,* 163 Mich. 477, 128 N. W. 723–725.

The case of *Maynard* v. *Hill,* 125 U. S. 190, 8 Sup. Ct. 723, 31 L. Ed. 654, on appeal from a judgment of the Supreme Court of the Territory of Washington, determined in 1888 by the Supreme Court of the United States, which is the final arbiter of questions relating to the federal constitution, is conclusive against the contention that a special legislative divorce act infringes rights guaranteed by that instrument. The question involved was the validity of an act of the territorial legislature which simply provided: "That the bonds of matrimony heretofore existing between D. S. Maynard and Lydia A. Maynard be, and the same are hereby, dissolved."

It was alleged in the complaint that no cause existed for the divorce; that no notice was given to the wife of any application by the husband for a divorce or pendency of the bill in the legislature; that she had no knowledge of the passage of the act until July, 1853; that at the time she was not within, and that she never became a resident of, the territory, and never acquiesced in or consented to the act; that the legislative assembly was without authority to pass the act; and that the same was void, and did not divorce the parties. Although such a

special act granting a divorce would be void under the provision of our constitution, the decision reached indicates that our statute does not conflict with any provision of the federal constitution, and would not even if it were a special instead of a classified divorce act and that the claim that it is void because special or infringing the rights guaranteed to the citizen is untenable.    Speaking for the Supreme Court of the United States in that case, Justice Field said:

"Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature.    That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution.

"*   *   *   Says Bishop, in his Treatise on Marriage and Divorce: 'The fact that at the time of the settlement of this country legislative divorces were common, competent, and valid in England, whence our jurisprudence was derived, makes them conclusively so here, except where an invalidity is directly or indirectly created by a written constitution binding the legislative power.' (Section 664.)    Says Cooley, in his Treatise on Constitutional Limitations: 'The granting of divorces from the bonds of matrimony was not confided to the courts in England, and from the earliest days the colonial and state legislatures in this country have assumed to possess the same power over the subject which was possessed by the parliament, and from time to time they have passed special laws declaring a dissolution of the bonds of matrimony in special cases.' (Page 110.)    Says Kent, in his Commentaries: 'During the period of our colonial government, for more than one hundred years preceding the Revolution, no divorce took place in the colony of New York, and for many years after New York became an independent state there was not any lawful

mode of dissolving a marriage in the lifetime of the parties but by a special act of the legislature.' (Volume 2, 97.) The same fact is stated in numerous decisions of the highest courts of the states. Thus in *Cronise* v. *Cronise*, 54 Pa. 260, the Supreme Court of Pennsylvania said: 'Special divorce laws are legislative acts. This power has been exercised from the earliest period by the legislature of the province, and by that of the state, under the constitutions of 1776 and 1790. The continued exercise of the power, after the adoption of the constitution of 1790, cannot be accounted for, except on the ground that all men, learned and unlearned, believed it to be a legitimate exercise of legislative power. This belief is further strengthened by the fact that no judicial decision has been made against it. *Communis error facit jus* would be sufficient to support it; but it stands upon the higher ground of contemporaneous and continued construction of the people of their own instrument.'

"In *Crane* v. *Meginnis*, 1 Gill & J. (Md.) 474, 19 Am. Dec. 237, the Supreme Court of Maryland said: 'Divorces in this state from the earliest times have emanated from the general assembly, and can now be viewed in no other light than as regular exertions of the legislative power.'

"In *Starr* v. *Pease*, 8 Conn. 451, decided in 1831, the question arose before the Supreme Court of Connecticut as to the validity of a legislative divorce under the constitution of 1818, which provided for an entire separation of the legislative and judicial departments. The court, after stating that there had been a law in force in that state on the subject of divorces, passed one hundred and thirty years before, which provided for divorces on four grounds, said, speaking by Mr. Justice Daggett: 'The law has remained in substance the same as it was when enacted in 1667. During all this period the legislature has interfered like the parliament of Great Britain, and passed special acts of divorce *a vinculo matrimonii;* and at almost every session since the constitution of the United States went into operation, now forty-two years,

and for thirteen years of the existence of the constitution of Connecticut, such acts have been, in multiplied cases, passed and sanctioned by the constituted authorities of our state.   We are not at liberty to inquire into the wisdom of our existing law on this subject, nor into the expediency of such frequent interference by the legislature.   We can only inquire into the constitutionality of the act under consideration.   The power is not prohibited either by the constitution of the United States or by that of the state.'   *   *   *

"The same doctrine is declared in numerous other cases, and positions similar to those taken against the validity of the act of the legislative assembly of the territory, that it was beyond the competency of a legislature to dissolve the bonds of matrimony, have been held untenable. These decisions justify the conclusion that the division of the government into three departments and the implied inhibition through that cause upon the legislative department to exercise judicial functions was neither intended nor understood to exclude legislative control over the marriage relation.   In most of the states the same legislative practice on the subject has prevailed since the adoption of their constitutions as before, which, as Mr. Bishop observes, may be regarded as a contemporaneous construction that the power thus exercised for many years was rightly exercised.   *   *   *   We are therefore justified in holding—more, we are compelled to hold—that the granting of divorces was a rightful subject of legislation according to the prevailing judicial opinion of the country, and the understanding of the profession, at the time the organic act of Oregon was passed by Congress, when either of the parties divorced was at the time a resident within the territorial jurisdiction of the legislature.

"*   *   *   As was said by Chief Justice Marshall in the Dartmouth College case, 17 U. S. (4 Wheat.) 519, 4 L. Ed. 629, not by way of judgment, but in answer to objections urged to positions taken: 'The provision of the constitution never has been understood to embrace other

contracts than those which respect property or some object of value, and confer rights which may be asserted in a court of justice. It never has been understood to restrict the general right of the legislature to legislate on the subject of divorces.'

"* * * When the contract to marry is executed by the marriage, a relation between the parties is created which they cannot change. Other contracts may be modified, restricted, or enlarged, or entirely released upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities. It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family, and of society, without which there would be neither civilization nor progress. This view is well expressed by the Supreme Court of Maine in *Adams* v. *Palmer*, 51 Me. 481, 483. Said that court, speaking by Chief Justice Appleton: 'When the contracting parties have entered into the married state, they have not so much entered into a contract as into a new relation, the rights, duties, and obligations of which rest not upon their agreement, but upon the general law of the state, statutory or common, which defines and prescribes those rights, duties, and obligations. They are of law, not of contract. It was of contract that the relation should be established; but, being established, the power of the parties as to its extent or duration is at an end. Their rights under it are determined by the will of the sovereign as evidenced by law. They can neither be modified nor changed by any agreement of parties. It is a relation for life, and the parties cannot terminate it at any shorter period by virtue of any contract they may make. The reciprocal rights arising from this relation, so long as it continues, are much as the law determines from time to time, and none other.' And again: 'It is not, then, a contract within the meaning of the clause of the constitution which prohibits the impairing the obligation of contracts. It is, rather, a social relation, like that of parent and child,

the obligations of which arise, not from the consent of concurring minds, but are the creation of the law itself; a relation the most important, as affecting the happiness of individuals, the first step from barbarism to incipient civilization, the purest tie of social life, and the true basis of human progress.' * * * And the chief justice cites, in support of this view, the case of *Maguire* v. *Maguire*, 7 Dana (Ky.) 181, 183, and *Ditson* v. *Ditson*, 4 R. I. 101. In the first of these the Supreme Court of Kentucky said that marriage was more than a contract; that it was the most elementary and useful of all the social relations, was regulated and controlled by the sovereign power of the state, and could not, like mere contracts, be dissolved by the mutual consent of the contracting parties, but might be abrogated by the sovereign will whenever the public good or justice to both parties, or either of the parties, would thereby be subserved; that being more than a contract, and depending especially upon the sovereign will, it was not embraced by the constitutional inhibition of legislative acts impairing the obligation of contracts."

[12] If, as petitioner contends, under the provisions of the United States constitution and the fourteenth amendment guaranteeing to the citizens of the various states equal protection of the laws, our statutes cannot discriminate against nonresidents desiring divorce, and our legislature cannot require persons coming to this state and seeking divorce to reside here one year, they cannot be required to reside here six months, nor for any length of time, but would be entitled to maintain an action for divorce for the causes specified under our laws, without taking up their residence here.

If, contrary to the doctrine universally recognized in other states and in foreign civilized countries, citizens of other states, without obtaining a domicile here, were entitled to apply for divorce in our courts under the provisions of the federal constitution granting citizens of other states equal protection of the laws, the same condition would exist in all the other states, for the federal

constitution applies equally to all, and every citizen of the United States would be free to go into any adjoining or other state where a divorce might be most easily obtained and start an action, without having any residence or domicile in that state. If residence may be required, necessarily the legislature must have the power to determine the period.

There is a distinction between citizenship and residence, and the rights of citizens and residents are often different. Citizens of the United States are native-born and foreigners who have been naturalized according to the laws of the United States after five years' residence. Even the rights of citizens are not always the same. Under the constitution, male persons over 21 years of age, who are citizens of the United States, and who have resided in this state six months, are entitled to vote and hold office, and females who have resided in the state one year are eligible to the offices of superintendent of schools and school trustee. In this and many other states females, although citizens and residents for the period required for males, are not allowed to vote, and in other states foreigners who were residents have been allowed the elective franchise. The qualifications prescribed by the state and federal constitutions relating to citizens and electors have no reference to divorce, a status pertaining to the internal affairs of the state and under the control of the lawmaking power, except as restricted or provided by the constitution. Under the rights assured to the citizen by the constitution, none in relation to divorce is guaranteed or specified.

No rights by implication follow from that document, except such as existed or were understood when it was adopted. For illustration, the constitution provides that "the right of trial by jury shall be secured to all, and remain inviolate forever." This insures only the right of trial by jury in ordinary civil and criminal actions as it existed at the time the constitution was adopted, but does not guarantee the right of trial by jury in an equity case (*Barton* v. *Barbour*, 104 U. S. 126, 26 L. Ed.

672), or in a proceeding for the collection of taxes, because there was no right to a jury in such cases at the time the constitution was adopted (*Kentucky Tax R. Cases*, 115 U. S. 321, 6 Sup. Ct. 57, 29 L. Ed. 414; *Bells Cap R. Co.* v. *Pennsylvania*, 134 U. S. 239, 10 Sup. Ct. 533, 33 L. Ed. 892).

[13] In the brief filed by counsel acting as a friend of the court, it is said that the amendment of 1913, which went into effect on the 1st of January, 1914, is prospective legislation, and not retrospective, and consequently that, as the complaint filed in the district court alleges that the cause of action accrued prior to the time when the act went into effect, the case does not come within the amendment, but is controlled by the statute previously in force, which required a residence of only six months.

As the amendment does not relate to the cause for divorce, but to the residence required before institution of suit, it may be considered as a matter of practice. Statutes extending or shortening the periods within which actions may be brought have often been held to apply to contracts existing or executed prior to the passage of the statute, and not to be unconstitutional when they shorten the time if they allow a reasonable period for the commencement of suit.

[14] If the amendment could be considered as relating to the cause for divorce, it would not be inimical to the constitutional provision prohibiting laws impairing the obligation of contracts, for, as we have seen, constitutional provisions of this nature do not apply to divorces, which are under the control of the legislature. (*Maynard* v. *Hill*, 125 U. S. 190, 8 Sup. Ct. 723, 31 L. Ed. 654; *People* v. *Dawell*, 25 Mich. 247, 12 Am. Rep. 260.)

Many religious people regard marriage as a sacrament. Our statute provides: "That marriage, so far as its validity in law is concerned, is a civil contract, to which the consent of the parties capable in law of contracting, is essential." (Rev. Laws, sec. 2338.)

In his work on Marriage and Divorce (6th ed.), Mr. Bishop says: "An executed marriage contract, which is that whereon any divorce operates, is not a contract. It is

a status.   Consequently the provision of the constitution now in contemplation has no relation whatever to divorce, whether legislative or judicial." (Section 667.)

"Marriage, being much more than a contract, and depending essentially on the sovereign will, is, not, as we presume, embraced by the constitutional interdiction of legislative acts impairing the obligation of contracts. The obligation is created by the public law, subject to the public will, and not to that of the parties.   That it is not within this constitutional provision may be deemed now to be settled doctrine." (Section. 8.)

In his work on Marriage, Divorce, and Separation, he states:

"Competent parties have always the law's approbation in marrying; but for divorce it requires a cause which itself has approved.   If, therefore, a statute authorizes divorce for a dereliction specified, it should in reason be applied equally to past as to future transactions; and so the courts will apply it, if nothing appears in the terms to forbid.   For the same reason it is applicable to past marriages the same as to future ones; consequently, also, it is not an infringement of constitutional guaranties.   In other words, the status of marriage, though it deeply affects the individual parties, is treated by the law as a public interest, to be molded, modified, or destroyed by the public demand." (Section 1492.)

In *Conner* v. *Elliot*, 18 How. 591, 15 L. Ed. 497, the Supreme Court of the United States held that no privileges are secured to citizens in the several states by section 2, art. 4, of the federal constitution, except those which belong to citizenship, and that marital rights attached to the contract of marriage are not included in such privileges.

[15-16] As divorce is not among the inalienable rights of man or the ones granted by Magna Charta, the federal or state constitution, or the common law, and, except at the will and subject to any restrictions imposed by the legislature, has never been recognized as one of the guaranteed privileges of the citizen, and as marriage is the most important of the domestic relations, and of

highest concern to the state, it follows that the right to have the bonds of matrimony dissolved is limited to the causes and subject to the requirement prescribed by the statute, and that the amendment, advisedly passed by the legislature, and recommended and approved by the governor, requiring a *bona fide* residence of one year, the period required in most of the states to give the court jurisdiction in an action for divorce, controls, instead of the earlier statute, designating six months, which served our people for half a century. Questions relating to the policy, wisdom, and expediency of the law are for the people's representatives in the legislature assembled, and not for the courts to determine. It is the duty of the courts to interpret and enforce the statute in accordance with the intention of the lawmaking body, unless it is clearly in conflict with some provision of the organic law. (*Ex Parte Boyce,* 27 Nev. 299, 75 Pac. 1, 65 L. R. A. 47, 1 Ann. Cas. 66; *Gibson* v. *Mason,* 5 Nev. 283.)

[17] Although the common law is progressive, and within its proper limitations, by judicial decision, advances to meet the new conditions which arise in the affairs of men, and new statutes are enacted as necessity may appear, the provisions of the constitution are adamant until changed by the people, and do not cover rights, privileges, and obligations not specified and not existing or understood at the time of its adoption, or not in force by long acquiescence, or by continued official or public approval.

As the parties were not residents of the state at the time the cause for divorce accrued, and neither was a *bona fide* resident of the state for one full year next preceding the commencement of the action, as required by the statute, the court was without jurisdiction, and the learned district judge properly refused to make an order for publication of summons.

The application for the writ is denied.

### ON PETITION FOR REHEARING

*Per Curiam:*

Rehearing denied.