140 Nev., Advance Opinion 8

# IN THE SUPREME COURT OF THE STATE OF NEVADA

ALEXANDER M. FALCONI,
Petitioner,
vs.
THE EIGHTH JUDICIAL DISTRICT
COURT OF THE STATE OF NEVADA,
IN AND FOR THE COUNTY OF
CLARK; AND THE HONORABLE
CHARLES J. HOSKIN, DISTRICT
JUDGE,
Respondents,
and
TROY A. MINTER; AND JENNIFER R.
EASLER,
Real Parties in Interest.

No. 85195



FILED

FEB 15 2024

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Original petition for a writ of mandamus or, alternatively, prohibition challenging local rules and a statute concerning access to certain court proceedings.

*Petition granted.*

Luke A. Busby, Reno,
for Petitioner.

Page Law Firm and Fred C. Page, Las Vegas,
for Real Party in Interest Troy A. Minter.

The Law Offices of Frank J. Toti, Esq., and Frank J. Toti, Las Vegas,
for Real Party in Interest Jennifer R. Easler.

24-05679

Legal Aid Center of Southern Nevada, Inc., and Debra A. Bookout, Las Vegas,
for Amici Curiae Legal Aid Center of Southern Nevada, Inc.; Nevada Legal Services; Northern Nevada Legal Aid; and Volunteer Attorneys for Rural Nevadans.

Pecos Law Group and Shann D. Winesett and Michelle A. Hauser, Henderson,
for Amicus Curiae State Bar of Nevada, Family Law Section.

Willick Law Group and Marshal S. Willick, Las Vegas,
for Amicus Curiae National American Academy of Matrimonial Lawyers Committee.

BEFORE THE SUPREME COURT, EN BANC.[1]

*OPINION*

By the Court, HERNDON, J.:

In June 2022, the Eighth Judicial District Court amended its local rules EDCR 5.207 and EDCR 5.212, partially based on NRS 125.080. Under this statute and the newly amended local rules, a child custody matter is automatically closed and a family court proceeding must be closed upon the request of a party. In practice, this means that a party has the right to prohibit the public's access to court proceedings without a judicial determination having been made that closure is necessary and appropriate. However, the public has a constitutional right of access to court proceedings.

---

[1]The Honorable Patricia Lee, Justice, did not participate in the decision in this matter. The Honorable Abbi Silver, Senior Justice, was appointed to sit in her place.

Because the local rules and the statute require the district court to close the proceeding, they eliminate the process by which a judge should evaluate and analyze the factors that should be considered in closure decisions, and by bypassing the exercise of judicial discretion, the closure cannot be narrowly tailored to serve a compelling interest. Thus, these local rules and NRS 125.080 violate the constitutional right of access to court proceedings. Accordingly, we hold that EDCR 5.207, EDCR 5.212, and NRS 125.080 are unconstitutional to the extent they permit closed family court proceedings[2] without the exercise of judicial discretion.

## FACTS AND PROCEDURAL HISTORY

On August 18, 2022, petitioner Alexander M. Falconi, who does business as the press organization Our Nevada Judges, filed a media request for camera access in a child custody proceeding between real parties in interest Troy Minter and Jennifer Easler. Easler did not oppose the media request, but Minter did. Minter argued that the parties' child was 15 years old and it was not in the child's best interest to have his personal information broadcasted to the general public or to be available for the child to access on the internet. Lastly, Minter asserted that the custody dispute should be considered private and confidential.

On the same day as Falconi's request, the district court entered an order sealing the record in the case. The next day, the district court denied Falconi's request because the case was sealed, so "EDCR 5.207 and EDCR 5.212 require the matter to be private" and Supreme Court Rules

---

[2]We note that this opinion only concerns the constitutionality of NRS 125.080, EDCR 5.2072, and EDCR 5.212. When in this opinion we refer to family law and/or family court proceedings, those terms do not include juvenile proceedings under NRS Title 5—Juvenile Justice.

limit media access to private matters. Falconi then filed the underlying writ petition, and this court invited amicus briefing.[3]

## DISCUSSION

*We exercise our discretion to entertain the writ petition*

"This court has original jurisdiction to issue writs of mandamus."[4] *Gardner v. Eighth Jud. Dist. Ct.*, 133 Nev. 730, 732, 405 P.3d 651, 653 (2017) (internal quotation marks omitted). "A writ of mandamus is available to compel the performance of an act that the law requires . . . or to control an arbitrary or capricious exercise of discretion." *Int'l Game Tech., Inc. v. Second Jud. Dist. Ct.*, 124 Nev. 193, 197, 179 P.3d 556, 558 (2008); NRS 34.160. "Writ relief is an extraordinary remedy that is only available if a petitioner does not have a plain, speedy and adequate remedy in the ordinary course of law." *In re William J. Raggio Fam. Tr.*, 136 Nev. 172, 175, 460 P.3d 969, 972 (2020) (internal quotation marks omitted); *see also* NRS 34.170. "This court has considered writ petitions when doing so will clarify a substantial issue of public policy or precedential value, and where the petition presents a matter of first impression and considerations of judicial economy support its review." *Washoe Cnty. Hum. Servs. Agency*

---

[3]At oral argument, counsel for amicus curiae National American Academy of Matrimonial Lawyers Committee, Marshal S. Willick, represented that he was speaking on behalf of both real parties in interest. After argument, Falconi filed a motion requesting this court correct the record because Willick was not authorized to argue on Easler's behalf, as she does not oppose the writ petition. We grant that motion and caution counsel of the need to be accurate in representations made before this court. *See, e.g.*, RPC 3.3(a) (requiring veracity in statements made by a lawyer to a tribunal).

[4]Falconi alternatively seeks a writ of prohibition. In light of Falconi's requested relief, we consider his petition as one for a writ of mandamus.

 

*v. Second Jud. Dist. Ct.*, 138 Nev., Adv. Op. 87, 521 P.3d 1199, 1203 (2022) (internal citations and quotation marks omitted).

Whether EDCR 5.207, EDCR 5.212, and NRS 125.080 are constitutional is a matter of first impression, and our consideration of their constitutionality serves judicial economy. *See, e.g., We the People Nev. v. Miller*, 124 Nev. 874, 878-88, 192 P.3d 1166, 1169-70 (2008) (exercising discretion to entertain a writ petition raising the question of whether a statute is constitutional); *Lyft, Inc. v. Eighth Jud. Dist. Ct.*, 137 Nev. 832, 834-40, 501 P.3d 994, 998-1002 (2021) (same). Additionally, the scope of the press's and public's access to courts is an important issue of law, as well as a substantial issue of public policy, warranting our extraordinary consideration. Further, issues of access to courts happen frequently but evade review because closed hearings often will have already occurred while the party denied access to the court challenges the closure of the hearing.[5] Lastly, we have recognized that direct appellate review is often not available to the press, and thus, writs for extraordinary relief may be necessary to challenge a denial of access. *See* SCR 243 (providing that the press may "seek extraordinary relief by way of writ petition" concerning the interpretation or application of the Supreme Court Rules); *Stephens Media, LLC v. Eighth Jud. Dist. Ct.*, 125 Nev. 849, 858, 221 P.3d 1240, 1246 (2009) (providing that a petition for extraordinary writ relief was appropriate

---

[5]Both Falconi and real parties in interest agree that this issue is not moot even though the hearing to which Falconi sought access has already occurred because the capable-of-repetition-yet-evading-review exception to the mootness doctrine applies. *See Washoe Cnty. Hum. Servs.*, 138 Nev., Adv. Op. 87, 521 P.3d at 1204 (providing that "cases involving moot controversies may still be considered by this court if they concern a matter of widespread importance capable of repetition, yet evading review" (internal quotation marks omitted)). We agree.

because "the press did not have an adequate remedy at law to challenge the district court's order denying its application to intervene"). Accordingly, we exercise our discretion to consider this petition.

*NRS 125.080 and the newly amended EDCRs*

NRS 125.080(1) provides that "[i]n any action for divorce, the court shall, upon demand of either party, direct that the trial and issue or issues of fact joined therein be private." NRS 125.080(2) provides that "upon such demand of either party, all persons must be excluded from the court or chambers wherein the action is tried, except" the parties, their counsel, witnesses, parents, or siblings. In order to exclude some of the people listed as exceptions to the closure, there must be a hearing where the requesting party shows good cause for the exclusion of that person. NRS 125.080(3).

As the parties acknowledge, the newly amended EDCR 5.212 was fashioned from the language in NRS 125.080. EDCR 5.212(a) provides that "the court shall upon demand of either party, direct that the hearing or trial be private." Subsection (b) of EDCR 5.212 then copies the language from NRS 125.080(2), which lists people excluded from that closure. Subsections (c) and (d) address when the excepted people may still be excluded from the proceedings. EDCR 5.212(e) provides that "[u]nless otherwise ordered or required by rule or statute regarding the public's right of access to court records, the record of a private hearing, or record of a hearing in a sealed case, shall be treated as confidential and not open to public inspection." While EDCR 5.212 does not specify to what types of proceedings it applies, because Part V of the EDCR governs family division matters and guardianships, it appears to broaden NRS 125.080's application from divorce cases to all proceedings occurring in family court.

The newly adopted EDCR 5.207 provides that "a case involving a complaint for custody or similar pleading addressing child custody or support between unmarried parties shall be construed as proceeding pursuant to NRS Chapter 126," which deals with parentage. NRS 126.211 provides that "[a]ny hearing or trial held under this chapter must be held in closed court without admittance of any person other than those necessary to the action or proceeding."[6] Additionally, NRS 126.211 provides that "[a]ll papers and records, other than the final judgment . . . are subject to inspection only upon consent of the court and all interested persons, or in exceptional cases only upon an order of the court for good cause shown." Thus, under the newly adopted EDCR 5.207, all custody actions must be closed and the records sealed.

*There is a constitutional right of access to family court proceedings*

Falconi contends that the press and the public have a constitutional right of access to family court proceedings and that NRS 125.080, EDCR 5.207, and EDCR 5.212 cannot withstand strict scrutiny because they permit closure of family court proceedings without granting the district court discretion to determine whether the closure is narrowly tailored to serve a compelling interest. We agree.

The United States Supreme Court has held that the public has a constitutional right of access to criminal trials and noted that "historically both civil and criminal trials have been presumptively open." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 & n.17 (1980). Since that case, the Supreme Court has yet to explicitly recognize a First Amendment right to access civil proceedings, but every federal circuit court that has

---

[6]Because no party asked us to consider the constitutionality of NRS 126.211, we do not do so here.

considered the issue has concluded that the constitutional right applies in both criminal and civil proceedings. *Courthouse News Servs. v. Planet* (*Planet III*), 947 F.3d 581, 590 (9th Cir. 2020) (citing to multiple cases, including cases that recognize the same). While this court has yet to have the opportunity to consider whether the constitutional right to access applies to civil proceedings, or even more specifically family law proceedings, we have followed the United States Supreme Court's precedent and held that it applies in criminal proceedings. *Stephens Media*, 125 Nev. at 860, 221 P.3d at 1248.

Given the "constant tension between the interest in public disclosure and privacy concerns," courts generally use the "experience and logic test" to determine whether there is a constitutional right of access. *Courthouse News Servs. v. Brown*, 908 F.3d 1063, 1069-70 (7th Cir. 2018). Under this test, courts consider "whether a proposed right reflects a well-developed tradition of access to a specific process and whether the right 'plays a significant role in the functioning of the particular process in question.'" *Id.* at 1070 (quoting *Press-Enter. Co. v. Superior Ct.* (*Press-Enter. II*), 478 U.S. 1, 8 (1986) (considering the right of access to preliminary hearings in criminal proceedings)). Even if there is an affirmative answer to the experience and logic test, the presumption of a First Amendment right of access can be overcome when the closure is necessary to preserve a compelling interest and is narrowly tailored to serve that interest. *Press-Enter. II*, 478 U.S. at 13-14.

*Civil proceedings are presumptively open*

We take this opportunity to expand our discussion in *Stephens Media*, which concluded that there is a right to access criminal proceedings, and hold that the right to access also applies in civil proceedings, including family law proceedings.

The presumption of open proceedings is grounded in both history and logic, as "the tradition of openness can be traced back to sixteenth-century English common law, which carried over to colonial America . . . [and] existed as common practice before the United States Constitution was ratified." *Stephens Media*, 125 Nev. at 859, 221 P.3d at 1247 (citing *Press-Enter. Co. v. Superior Ct. (Press-Enter. I)*, 464 U.S. 501, 505-08 (1984), and *Richmond Newspapers*, 448 U.S. at 589 (Brennan, J., concurring)); *see also Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1068 (3d Cir. 1984) (recognizing a tradition of openness for civil trials in English common law). "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press-Enter. I*, 464 U.S. at 508. Thus, courts have recognized that "[o]penness in judicial proceedings enhances both the basic fairness of the proceeding and the appearance of fairness so essential to public confidence in the system, and forms an indispensable predicate to free expression about the workings of government." *Planet III*, 947 F.3d at 589 (internal citations and quotation marks omitted).

In light of the important role open court proceedings play, and in accordance with the jurisdictions that have considered this issue, we conclude there is a presumption that civil proceedings must be open, just like criminal proceedings. *See, e.g., NBC Subsidiary (KNBC-TV), Inc. v.*

Supreme Court
of
Nevada

(O) 1947A

9

*Superior Ct.*, 980 P.2d 337, 359-61 (Cal. 1999) (concluding that "in general, the First Amendment provides a right of access to ordinary civil trials and proceedings" after recognizing that the United States Supreme Court "has not accepted review of any of the numerous lower court cases that have found a general First Amendment right of access to civil proceedings" and providing that "we have not found a single lower court case holding that generally there is no First Amendment right of access to civil proceedings").

Further, we conclude there is no reason to distinguish family law proceedings from civil proceedings in this context. Traditionally, across the nation, family law proceedings are, and have been, presumptively open. *See* W. Thomas McGough, Jr., *Public Access to Divorce Proceedings: A Media Lawyer's Perspective*, 17 J. Am. Acad. Matrim. Law, 29, 31 (2001) (citing to both 24 Am. Jur. 2d *Divorce and Separation* § 303 (1998), and constitutional provisions from 24 states that guarantee public access to courts); 24 Am. Jur. 2d *Divorce and Separation* § 283 (2023); *see also, e.g., In re Burkle*, 37 Cal. Rptr. 3d 805, 816-17 (Ct. App. 2006) (recognizing that family law proceedings are presumptively open across the country); *In re Rajea T.*, 165 N.Y.S.3d 647, 651 (N.Y. App. Div. 2022) ("This fundamental presumption of public access to judicial proceedings applies equally to matters heard in Family Court." (internal quotation marks and punctuation omitted)); *N.J. Div. of Youth and Fam. Servs. v. J.B.*, 576 A.2d 261, 269 (N.J. 1990) (recognizing that while there may often be circumstances warranting a closure of parental rights termination proceedings, those proceedings cannot be automatically closed and the court must consider the circumstances of each individual case in determining if closure is appropriate); *Copeland v. Copeland*, 930 So. 2d 940, 941 (La. 2006) (explaining that, in light of the presumption of open proceedings, an action

SUPREME COURT
OF
NEVADA

(O) 1947A

10

cannot be closed or sealed merely because it involves the custody of minor children); *France v. France*, 705 S.E.2d 399, 408 (N.C. Ct. App. 2011) (providing in a child custody action that "[w]hile a trial court may close proceedings to protect minors in certain situations . . . we can find no case supporting the closing of an entire proceeding merely because some evidence relating to a minor child would be admitted"). While Minter and two of the amici argue that this court need only consider whether family law proceedings in Nevada have been traditionally open, we conclude the constitutional question is not one of Nevada's history regarding family law proceedings, but one of whether family law proceedings have historically been open across the United States. *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993) (concluding that "the 'experience' test of *Globe Newspaper* does not look to the particular practice of any one jurisdiction, but instead to the experience in that *type* or *kind* of hearing throughout the United States" (internal quotation marks omitted)). Thus, because family law proceedings have been historically open nationwide, the first part of the experience and logic test has been met.[7]

Next, we must consider the logic portion of the test, and we conclude that open family law proceedings play a significant role in the functioning of the family court, warranting a presumption of open access. *Press-Enter. II*, 478 U.S. at 8-12 (describing the experience and logic test as applied to criminal preliminary hearings and noting with regard to the logic test "that public access to criminal trials and the selection of jurors is

---

[7]While our dissenting colleagues provide an exhaustive history of early family law cases and tradition, they do not address the more recent family law precedent across the country and do not consider precedent applying the requisite experience and logic test and concluding that the historical evidence supports a tradition of open family court proceedings.

essential to the proper functioning of the criminal justice system"). As the Ninth Circuit has recognized, "[t]he right of access is . . . an essential part of the First Amendment's purpose to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Planet III*, 947 F.3d at 589 (internal citations and quotations omitted). And as described by the Second Circuit Court of Appeals, "public access to civil trials enhances the quality and safeguards the integrity of the factfinding process, fosters an appearance of fairness, and heightens public respect for the judicial process—an essential component in our structure of self government." *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 23 (2d Cir. 1984) (internal quotations and citations omitted); *see also Del Papa v. Steffen*, 112 Nev. 369, 374, 915 P.2d 245, 249 (1996) ("[O]pen court proceedings assure that proceedings are conducted fairly and discourage perjury, misconduct by participants, and biased decision making."). This is especially important in a state where citizens elect their judges because it ensures that the public has the necessary knowledge to serve as a check on the judicial branch on election day. *See Del Papa*, 112 Nev. at 374, 915 P.2d at 249 ("The operations of the courts and the judicial conduct of judges are matters of utmost public concern." (internal quotation marks omitted)). Further, as Falconi argues, and we agree, having open family law proceedings is important because many family law parties appear pro se and open proceedings provide such litigants with examples of what they can expect in their own case. Accordingly, because both portions of the experience and logic test are met, we conclude that civil proceedings, and specifically family law proceedings, are presumptively open.

 

*The presumption cannot be overcome because the rules and NRS 125.080 are not narrowly tailored*

Once the presumption of a constitutional right of access attaches, that presumption can only be overcome "if 'closure is essential to preserve higher values and is narrowly tailored to serve those interests.'" *Planet III*, 947 F.3d at 595 (quoting *Press-Enter. II*, 478 U.S. at 13-14). Thus, to overcome the presumption, one must show three things: (1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest could be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest. *Press-Enter. II*, 478 U.S. at 13-14.

We acknowledge that there is an interest in protecting litigants' privacy rights in family law proceedings, as those proceedings apply wholly to their private lives. *See, e.g.*, *In re Marriage of Burkle*, 37 Cal. Rptr. 3d 805, 807-18 (Ct. App. 2006). However, a litigant's privacy interests do not automatically overcome the press's and the public's right to access court proceedings. In fact, the majority of jurisdictions to have considered this issue have concluded that when there are no extraordinary circumstances present, the public's right to access family law proceedings outweighs the litigants' privacy interests. Laura W. Morgan, *Strengthening the Lock on the Bedroom Door: The Case Against Access to Divorce Records On Line*, 17 J. Am. Acad. Matrim. Law. 45, 59 (2001) ("[T]he trend in the case law has been clear: divorce court records are open to the public, and the privacy rights of the individual must yield to the First Amendment when all factors are equal.").

EDCR 5.207 automatically closes child custody actions, and NRS 125.080 and EDCR 5.212 require closure upon a party's request, eliminating the district court's discretion to weigh when a closure is warranted and when the public's right of access warrants keeping the proceeding open. Additionally, they prevent the district court from considering alternatives to closure that might protect the parties' privacy while still keeping the proceeding open. In any other proceedings in Nevada, before a district court can close those proceedings "(1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; (2) the closure must be no broader than necessary to protect the overriding interest; (3) the trial court must consider reasonable alternatives to closing the proceeding; and (4) the trial court must make findings adequate to support the closure." *Feazell v. State*, 111 Nev. 1446, 1449, 906 P.2d 727, 729 (1995) (internal quotation marks omitted).

It should be noted that the closure of various family law proceedings can and will be warranted in various instances. What we recognize today is the critical importance of the public's access to the courts and the role that thoughtful, reasoned judicial decision-making plays in identifying the compelling interests at stake and determining: (1) if and when to order closure in any proceeding, be it family, civil, or criminal in nature; and (2) to what extent such closure should apply. We conclude that family court parties' privacy interests do not warrant a different standard for closed proceedings. The test that district courts apply on a case-by-case basis in closing proceedings in all other matters in Nevada can and will sufficiently protect family court parties' privacy interests. Failure to consider whether to close a proceeding on a case-by-case basis, which is not a significantly high burden, falls short of the *Press-Enterprise II*

SUPREME COURT
OF
NEVADA

(O) 1947A

14

requirement that closure is narrowly tailored to serve a compelling interest. 478 U.S. at 13-14. Accordingly, because family law proceedings are presumptively open and NRS 125.080, EDCR 5.207, and EDCR 5.212 preclude the district court from applying the balancing test to overcome that presumption on a case-by-case basis, they are unconstitutional in this regard.[8]

## CONCLUSION

NRS 125.080, EDCR 5.207, and EDCR 5.212 violate the constitutional right to access court proceedings. Family law proceedings are presumptively open, as they have been traditionally open across the country and the openness of the proceedings plays a significant role in the functioning of the family court. Because NRS 125.080, EDCR 5.207, and EDCR 5.212 preclude the district court's exercise of discretion in closing proceedings, they are not narrowly tailored to serve a compelling interest. Thus, we hold that NRS 125.080, EDCR 5.207, and EDCR 5.212 are unconstitutional to the extent they permit closed court proceedings without the exercise of judicial discretion. Accordingly, we grant Falconi's petition and direct the clerk of this court to issue a writ of mandamus instructing

---

[8]Because we conclude that EDCR 5.207 and EDCR 5.212 are unconstitutional to the extent they permit closed court proceedings without the exercise of judicial discretion, we need not address Falconi's argument that SRCR 3(5)(c) and SCR 230 preempt them.

SUPREME COURT
OF
NEVADA

(O) 1947A

the district court to vacate its order denying media access in the underlying child custody case.

_____, J.
Herndon

We concur:

_____, C.J.
Cadish

_____, J.
Pickering

_____, Sr. J.
Silver

SUPREME COURT
OF
NEVADA

(O) 1947A

STIGLICH, J., with whom PARRAGUIRRE and BELL, JJ., agree, dissenting:

Today's disposition errs in treating all family law cases uniformly and in treating family law cases the same as all other civil proceedings. Family law encompasses many types of proceedings with disparate origins and traditions of openness and should be distinguished from other civil proceedings in these regards. As to divorce and child custody proceedings specifically, neither distinct traditions of openness nor logic support finding a First Amendment qualified right of public access. And as no right of access exists, strict scrutiny does not apply, and the controlling standards dictate that a different result should be reached.

Before inquiring into these traditions, it is important to note that the disposition renders an advisory opinion. This writ petition arises from a child custody proceeding, not a divorce proceeding. The disposition, however, invalidates an uninvolved divorce statute that is not at issue here. To reason that the divorce statute can be struck because rules pertaining to child custody proceedings are based on it is an improper way to evaluate a statute's constitutionality. *Cf. Echeverria v. State*, 137 Nev. 486, 489, 495 P.3d 471, 475 (2021) (rephrasing a certified question to avoid addressing a related but not presented issue because doing otherwise would render an advisory opinion); *Personhood Nev. v. Bristol*, 126 Nev. 599, 602, 245 P.3d 572, 574 (2010) ("This court's duty is not to render advisory opinions but, rather, to resolve actual controversies by an enforceable judgment."). This reflects another facet of the misstep of treating all family law cases as alike.

While the disposition correctly notes that the court must look to the historic experience of the type of hearing in determining the tradition of openness, the analysis does not do so, instead relying on a general

assertion of traditional openness. Courts properly look to the origins of the specific type of proceeding in assessing its experience of openness. *See, e.g., N.J. Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 201 (3d Cir. 2002) (noting the lack of a tradition of openness in deportation proceedings and concluding that there is no First Amendment right of access in such matters); *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 11-12 (1st Cir. 1986) (considering the history of civil discovery proceedings and concluding that it does not exhibit a tradition of openness). The disposition takes the opposite approach, going so far as to state that civil proceedings, writ large, are presumptively open. This is incorrect. The majority's reliance on *NBC Subsidiary (KNBC-TV), Inc. v. Superior Ct.*, 980 P.2d 337 (Cal. 1999), for the proposition that civil law proceedings must be open misapplies that decision. *NBC Subsidiary* stated that no court has held that the right of access, as a general matter, cannot be found to apply to a civil proceeding. *Id.* at 358-59. This does not entail that the right of public access *does* apply to *all* civil proceedings. The most *NBC Subsidiary* stands for in this regard is a presumption of openness for "ordinary civil trials," and that court significantly provided that its holding did not apply to "particular proceedings governed by specific statutes" such as the Family Code. *Id.* at 361 & n.30. To extend this reasoning to encompass all proceedings that may colorably be called "family law" proceedings conflicts with the Supreme Court's direction to consider openness as to the *particular type* of hearing. *El Vocero de Puerto Rico (Caribbean Int'l News Corp.) v. Puerto Rico*, 508 U.S. 147, 150 (1993).

When the United States Supreme Court has considered the tradition of openness in criminal proceedings, it has examined the origins of the jury system in England before the Norman Conquest and observed

that the public character of trials remained constant. *Press-Enter. Co. v. Superior Ct.*, 464 U.S. 501, 505 (1984); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 565-66 (1980) (Burger, C.J., plurality opinion). As is obvious, this matter does not involve the right of public access to criminal proceedings at any stage. The opinion here strikes a statute concerning divorce proceedings, NRS 125.080, and rules concerning child custody and maintenance, EDCR 5.207, and proceedings in the family division, EDCR 5.212. In determining whether there is a right of public access, the court should look to the specific traditions of those types of proceedings. *El Vocero de Puerto Rico*, 508 U.S. at 150-51 (providing that the "experience" test looks "to the experience in that *type* or *kind* of hearing" (internal quotation marks omitted)). The historical backdrop of each type of family proceeding radically departs from that of the criminal proceedings examined by the Supreme Court.[1]

Let us begin with divorce. Historically, while criminal matters invariably proceeded in open fora, divorce actions did not. The English tradition provided the context in which the United States Constitution was adopted and is instructive for interpreting these principles of our organic law. *Richmond Newspapers*, 448 U.S. at 569; *see Worthington v. Dist. Ct. of Second Jud. Dist.*, 37 Nev. 212, 230, 142 P. 230, 237 (1914) (providing that "the law of divorce as it existed at and prior to the time of the adoption of the Constitution should be considered" in reviewing a constitutional challenge to a durational residence statute). When the Constitution was

---

[1]The disposition's response to the ensuing analysis as not taking into account recent developments misapprehends the standard. As the hallmark Supreme Court analyses of this right show, what matters are the origins of the type of proceeding.

SUPREME COURT
OF
NEVADA

(O) 1947A

adopted, sole jurisdiction for divorce actions in England lay with ecclesiastical courts, where it remained until 1857. *Worthington*, 37 Nev. at 230-31, 142 P. at 237; *Morgan v. Foretich*, 521 A.2d 248, 252 (D.C. 1987).

Early American authorities recognized this tradition. *Schwab v. Schwab*, 54 A. 653, 655 (Md. 1903) ("[O]ur predecessors said that the decisions of the English ecclesiastical courts have been uniformly cited and relied on as safe and authoritative guides for the courts of this state in disposing of divorce cases."). In *Scott v. Scott*, Viscount Haldane described to the House of Lords the closed practices of the ecclesiastical courts:

> [I]t was not their practice to take evidence viva voce in open Court. The evidence was taken in the form of depositions before commissioners, who conducted their proceedings in private. The parties were not represented at this stage in the fashion with which we are familiar. When a witness was tendered for examination the commissioners could, in the course of taking his deposition, put to him interrogatories delivered by the other side, but there was no cross-examination, or, for that matter, examination-in-chief, of the parties. Each side could tender witnesses, but until the evidence was complete neither side was allowed to see the depositions which had been taken. After the commissioners had finished their work, what was called publication took place. This did not mean that the evidence was published to the world, but only that the parties had access to it.

[1913] AC 417 (HL) 417, 433 (appeal taken from Eng.), https://www.iclr.co.uk/wp-content/uploads/media/vote/1865-1914/Scott_ac1913-1-417.pdf. The practice described in *Scott* is hardly what we would now describe as an open court. The experience in ecclesiastical courts thus did not feature an abiding "public character" akin to that of criminal matters that led the

Supreme Court to find a presumption of openness. *Press-Enter.*, 464 U.S. at 506-08.

The disposition's statement that "family law" proceedings were traditionally open does not consider the tradition of divorce proceedings, conflates all family law proceedings as arising from the same tradition, and is mistaken.[2] Absent a presumption of openness in divorce proceedings,

---

[2]While the disposition cites a law journal article's observation that 24 state constitutions have open-court provisions, this proposition is of little use here, given that it neglects to differentiate between types of proceedings. *See San Bernardino Cnty. Dep't of Pub. Soc. Servs. v. Superior Ct.*, 283 Cal. Rptr. 332, 343 n.9 (Ct. App. 1991) (rejecting that juvenile proceedings may be simplistically labeled "civil" or "criminal" without engaging with the unique attributes of that type of proceeding); *Morgan*, 521 A.2d at 252 n.11 ("Although technically classified as civil cases, family proceedings do not have the same historical presumption of openness as discussed above."). Moreover, these constitutional provisions have yielded disparate outcomes, as, for instance, Louisiana's open-court provision has been held to require open divorce proceedings, *Copeland v. Copeland*, 966 So. 2d 1040, 1045 (La. 2007), while Delaware's has not, *C. v. C.*, 320 A.2d 717, 728 (Del. 1974). And of course, the Nevada Constitution features no such provision. Other decisions relied on in this context also lack the force given to them. *In re Burkle*, 37 Cal. Rptr. 3d 805, 816-17 (Ct. App. 2006), does not recognize that family law proceedings were presumptively open across the country; rather, *Burkle* did not consider any nationwide practice but did "find nothing to suggest that, in general, civil trials in divorce cases have not historically been open to the public just as any other civil trial," *id.* at 814. *Burkle*, however, offered no supporting authorities for this bare statement and did not examine the tradition of divorce proceedings. As the discussion here shows *Burkle*'s factual proposition to be incorrect, *Burkle* is not persuasive in this regard. Similarly, *In re Rajea T.*, 165 N.Y.S.3d 647, 651 (App. Div. 2022), is not instructive, considering that its presumption of openness rests on a New York rule providing "[t]he Family Court is open to the public," N.Y.C.R.R. § 205.4, consistent with a statutory right of openness, N.Y. Jud. § 4 (providing that court proceedings are public with certain exceptions stated). *N.J. Div. of Youth & Fam. Servs. v. J.B.*, 576 A.2d 261, 269 (N.J. 1990), meanwhile presumes that termination-of-

NRS 125.080 should not be reviewed for strict scrutiny but rather for whether it has a rational basis. Finding a rational basis to permit parties to close divorce proceedings is not hard, and the Supreme Court has done so in a different context, observing that "the common-law right of inspection has bowed before the power of a court to insure that its records are not 'used to gratify private spite or promote public scandal' through the publication of 'the painful and sometimes disgusting details of a divorce case.'" *Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 598 (1978) (quoting *In re Caswell*, 29 A. 259 (R.I. 1893)).

The nature of divorce law establishes further the distance of its tradition from that of civil proceedings more generally. The ecclesiastical courts were not common law courts, but rather "administered the unwritten law of the realm" on matters within their jurisdiction. *Foote v. Nickerson*, 48 A. 1088, 1089 (N.H. 1901). Given that there has not been an ecclesiastical-court tradition in the United States, adopting the common law did not incorporate a body of divorce law in the states of the United States, and states built their doctrines of divorce law by statutory enactment. *Worthington*, 37 Nev. at 231, 142 P. at 237; *cf. Ex parte Burrus*, 136 U.S. 586, 593-94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the

---

parental-rights proceedings *will be closed* to the public, not open. *Copeland v. Copeland*, 930 So. 2d 940, 941 (La. 2006), rests its openness determination on a controlling state constitutional provision, *cf.* La. Const. Art. 1, § 22 ("All courts shall be open . . . ."). And the court in *France v. France*, 705 S.E.2d 399, 408 (N.C. Ct. App. 2011), stated that a matter should not be closed unless a specific statutory mandate closing that type of proceeding applies, such as one closing adoption proceedings. *France* would support the constitutionality of the provisions invalidated here.

laws of the United States."). Two aspects warrant particular mention in this regard.

First, in early American practice, the legislature itself would issue a divorce as a "legislative declaration by special act." *People ex rel. Christiansen v. Connell*, 118 N.E.2d 262, 266 (Ill. 1954); *see also C. v. C.*, 320 A.2d at 726 ("Since our first divorce statute in 1832, it has been recognized that divorce jurisdiction emanated solely from the act of the General Assembly and not from common law."); *cf. Crane v. Meginnis*, 1 G. & J. 463, 474 (Md. 1829) ("[D]ivorces in this State from the earliest times have emanated from the General Assembly, and can now be viewed in no other light, than as regular exertions of legislative power."). Legislatures ultimately granted courts jurisdiction over divorce proceedings but retained the paramount role in setting forth the procedure and substantive law regarding divorce. *Christiansen*, 118 N.E.2d at 266; *see also Worthington*, 37 Nev. at 234-35, 142 P. at 238 (collecting cases supporting the propositions that jurisdiction regarding divorce is purely statutory and that legislatures are empowered to enact controlling provisions).

Second, the central role of a legislature in this regard arises from the subject regulated itself. As the United States Supreme Court has recognized, "[m]arriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature." *Maynard v. Hill*, 125 U.S. 190, 205 (1888). The Florida Supreme Court has relatedly observed that "[s]ince marriage is of vital interest to society and the state, it has frequently been said that in every divorce suit the state is a third party whose interests take precedence over the private interests of the spouses." *Posner v. Posner*, 233 So. 2d 381, 383 (Fla. 1970). A

Supreme Court
of
Nevada

(O) 1947A

7

legislature has a heightened role in enacting statutes to implement a state's public policy regarding divorce, as divorce is historically apart from the common law tradition and involves matters of elevated public policy significance. The Nevada Legislature has enacted a statute permitting parties to a divorce to close the proceedings at their discretion. The court here should be reticent to overturn the Legislature's expression of public policy.

Just as family law cases cannot be treated as a monolith alongside other civil proceedings, matters now regarded collectively as family law proceedings do not emerge from like traditions of openness. And so I conclude that the tradition of child custody proceedings does not support a presumption of openness either, but for different reasons. Traditionally, courts have placed the best interests of the child as the paramount aim of custody proceedings and have not felt bound by strict procedural rules, tolerating closed proceedings where the circumstances warrant.

Unlike the strict ecclesiastical jurisdiction governing divorce proceedings, child custody matters were customarily placed within chancery courts. *In re Morgan*, 21 S.W. 1122, 1123 (Mo. 1893). Except when resolved as incident to a separate action for divorce, a custody action would commence by application to the chancellor or by petition for a writ of habeas corpus. *Finlay v. Finlay*, 148 N.E. 624, 626 (N.Y. 1925) (Cardozo, J.); William Pinder Eversley, *The Law of the Domestic Relations* 545 (London, Stevens & Haynes 1885). This approach was well established in both American and English law. *State ex rel. Herrick v. Richardson*, 40 N.H. 272, 274 (1860).

Analogous to the special interest the legislature takes in matters of divorce, the court traditionally occupied a role distinct from that

of more general litigation. In the seminal chancery court case *De Manneville v. De Manneville*, the court explained that it adjudicated custody matters as parens patriae, exercising power as the representative of the monarch in resolving the habeas petition however best served the child. *De Manneville v. De Manneville* (1804), 32 Eng. Rep. 762, 765. In describing the Anglo-American tradition in this regard, Judge Cardozo recognized that the chancellor here does not adjudicate a dispute between two parties but rather acts as parens patriae "to do what is best for the interest of the child," as though "in the position of a 'wise, affectionate, and careful parent,' . . . 'by virtue of the prerogative which belongs to the Crown as parens patriae.'" *Finlay*, 148 N.E. at 626 (quoting a Queen's Bench decision); *see also Pearce v. Pearce*, 33 So. 883, 884 (Ala. 1903) ("The character and purpose of the proceedings [involving child custody] are different from an action where only the rights of the parties litigating are involved."). In the United States, the court stands in parens patriae as the representative of the people, duty bound to protect children and act in their best interests. *Helton v. Crawley*, 41 N.W.2d 60, 70 (Iowa 1950). This role—and its extreme delicacy—was deemed "indispensable to good order and the just protection of society" and is of a long provenance in our system of law. *People ex rel. Brooks v. Brooks*, 35 Barb. 85, 87-88 (N.Y. Gen. Term. 1861). And so, from this tradition, the court has had its own role in custody proceedings, as distinguishable from simply adjudicating a dispute between two parties.

In determining what best served a child's interest in custody adjudications, courts have traditionally been less constrained by formal rules, and a tradition of openness ascribable to civil cases cannot be extended to include custody proceedings. Courts have distinguished custody proceedings from those cases "proceed[ing] under the common-law

Supreme Court
OF
Nevada

(O) 1947A

9

system of procedure" to conclude that strict pleading rules do not apply. *People ex rel. Keator v. Moss*, 39 N.Y.S. 690, 692 (App. Div. 1896). A court in these matters traditionally "is not bound down by any particular form of proceeding," which may include proceedings in open court or resolving the matter "from its own knowledge alone," so long as it considers all of the circumstances. *Cowles v. Cowles*, 8 Ill. (3 Gilm.) 435, 438 (1846). The court may traverse beyond "ordinary modes of trial," examine a child privately, and withhold information concerning a parent's character, so long as the decision promotes the child's welfare. *Dumain v. Gwynne*, 92 Mass. (10 Allen) 270, 275 (1865). Simply, the court "may interfere at any time and in any way to protect and advance [the child's] welfare and interests." *In re Bort*, 25 Kan. 308, 310 (1881). An early treatise explained the procedure more fully, explaining that a custody hearing pursuant to a habeas petition proceeded without a jury, characterizing it more as an inquisition than a trial. Lewis Hochheimer, *A Treatise on the Law Relating to the Custody of Infants* 70-71 (Baltimore, Harold B. Scrimger 3d ed. 1899). The outcome should not turn on any procedural technicality, and the court is not limited "to the ordinary modes of trial," should seek out "the exact truth," and "may examine the child privately." *Id.* at 71; *see also* Eversley at 526 (recognizing that private examination of a child may be warranted for sensitive questions regarding religion). Both the role of the court and the nature of the proceedings are distinguishable from those of civil proceedings generally, and the tradition of child custody proceedings does not exhibit a custom of openness. Therefore, I would not conclude that a First Amendment qualified right of public access is present in such matters.

Logic should militate against finding a presumption of openness as well. In presuming that custody proceedings be open, the disposition

limits what rules may be enacted to facilitate proceedings to only what may survive strict scrutiny. This places an obstacle on the court's pursuit of the child's best interests, by presuming that openness rather than privacy best serves the child. It also burdens parties who are in a delicate and possibly traumatic situation with proving that privacy is a narrowly tailored means to attain a compelling state interest.

The Florida Supreme Court reached an analogous outcome in concluding that a statute mandating the closure of adoption proceedings was constitutional. *In re Adoption of H.Y.T.*, 458 So. 2d 1127, 1128 (Fla. 1984). It noted that the court in such proceedings had a different role than disinterestedly resolving claims from competing parties, given that the court must serve the best interests of the child. *Id.* The court declined to subject parties to an adoption to the burden of showing that their privacy interests should be protected where the legislature by statute enacted the public policy of protecting privacy rights in that context. *Id.* at 1128. Florida courts later upheld the constitutionality of statutes closing termination-of-parental-rights proceedings with the same reasoning, *Nat. Parents of J.B. v. Fla. Dep't of Child. & Fam. Servs.*, 780 So. 2d 6, 10-11 (Fla. 2001), and dependency proceedings by extension of *H.Y.T.*, *Mayer v. State*, 523 So. 2d 1171, 1174-75 (Fla. Dist. Ct. App. 1988).

California decisions involving the law's treatment of children show how protecting their interests requires paying more heed to protecting their privacy. In the juvenile justice context, the California Court of Appeal upheld a confidential-records statute because privacy served protective and rehabilitative purposes, consistent with the aims of the juvenile justice system "to promote [the minor's] best interests, facilitate rehabilitation or family reunification, and protect the minor from present and future adverse

consequences and unnecessary emotional harm." *People v. Connor*, 9 Cal. Rptr. 3d 521, 533 (Ct. App. 2004). Similarly, the risk that third parties would obtain damaging information and deny future opportunities to minors posed an unjustifiable threat to the juvenile court's rehabilitative goals. *T.N.G. v. Superior Ct.*, 484 P.2d 981, 988 (Cal. 1971). This reasoning has been carried over to dependency proceedings, where privacy serves the rehabilitative purpose of the proceedings. *San Bernardino Cnty. Dep't of Pub. Soc. Servs. v. Superior Ct.*, 283 Cal. Rptr. 332, 340 (Ct. App. 1991). Neither experience nor logic support concluding that there is a qualified right of public access to custody proceedings. This is not to say that there is not considerable value to openness, but that interest should be balanced with relevant privacy interests as a matter of public policy.

Further, the public policy consequences of the disposition are concerning. By concluding—without any appropriate consideration of different types of proceedings—that family law proceedings are both traditionally open and logically should be publicly accessible, the analysis renders presumptively unconstitutional NRS 127.140(1) (making adoption proceedings confidential), NRS 128.090(5) (closing court for termination-of-parental-rights proceedings), and undoubtedly other comparable statutes. The opinion thus poses a significant risk to the enacted public policy that these and other statutes represent. The traditions of divorce and child custody demonstrate a long-standing recognition that public policy has an outsized role in these subjects. The Legislature's critical role in setting forth—with the input and participation of members of the community—what should be open and under what circumstances should not be lightly cast aside. Because today's disposition has misconstrued authority it

critically relies upon, has invalidated a statute not properly at issue, has neglected to specifically consider the types of proceedings at issue and accordingly has not recognized the relevant traditions of those proceedings, and has reached a broad holding that will upend large swathes of law, I respectfully dissent.

_____, J.
Stiglich

I concur:

_____, J.
Parraguirre

_____, J.
Bell

SUPREME COURT
OF
NEVADA

(O) 1947A